Bruce McM. Wright, J.
Plaintiff, as assignee of Davega Distributing Corp., sues to recover $406.32, the purchase price *1012 and various finance charges for a television set bought by the defendant. As there is no proved defense to the assignee’s complaint, the only issue before the court is whether the insurance paid for by the defendant at the time of his television purchase must be honored by the third-party defendant, so that the defendant may have judgment over against Balboa Insurance Co.
The competing facts, as testified to upon the trial without a jury, are simple. On June 1, 1973, defendant purchased from Davega what he believed to be a new Sylvania television set. He paid $75 on account, with the balance to be paid over a period of 24 months. At the time this arrangement was made, the Davega salesman suggested burglary insurance which was accepted by defendant and paid for. On June 8, 1973, Davega assigned its installment contract to plaintiff.
Sometime during the evening of June 15, or the early morning of June 16, 1973, while the defendant was at work, his apartment was burglarized and the television set was taken. Defendant immediately reported his loss to the police, received a police report and, on the next business day, June 18, he spoke to a Paul Ricardo at plaintiff’s office. It is the facsimile signature of Paul Ricardo which appears on the certificate of insurance issued by Balboa to the defendant and it was Ricardo who assured defendant that his claim would be honored within 60 days. When this did not occur, defendant returned to Ricardo’s office, only to be told that the earlier accepted police report of the burglary had been lost. Defendant purchased another, submitted it to Ricardo and continued to visit that office only to be told in 1973, some five months after the burglary and the initial report, that his claim had been rejected. Defendant was never informed of the reason for the rejection.
Upon the trial, Balboa called no witnesses, but placed in evidence its master policy, the document referred to in the certificate of insurance issued to defendant. The language on the face of the certificate says that "This coverage is provided by the Master Policy issued by the Balboa Insurance Company. The Master Policy contains a more detailed description of the perils covered and exceptions and is available for inspection at your request.” The certificate further states that the merchandise purchased by defendant was insured against "burglary.” There is no definition of that term contained in the certificate and no express limitations on the coverage *1013 represented by the certificate, other than the reference to the master policy.
The master policy was never exhibited to defendant and he never requested permission to read it. No claim by Balboa that Ricardo lacked authority to issue the certificate has been made or established. Indeed, by urging the contents of the master policy to modify language in the certificate, Balboa has confirmed the agency of Ricardo.
The more "detailed description” relied upon by Balboa to alter the meaning of the word "burglary” in the certificate issued to defendant is found in paragraph 5(G) of the Master Policy. It is there stated as follows: "Burglary, meaning the felonious abstraction of insured property from within the premises by a person making felonious entry by actual force and violence as evidenced by visible marks made by tools, explosives, electricity or chemicals upon, or physical damage to, the exterior of the premises at the place of such entry.”
Under "Conditions,” paragraph 10 of the master policy purports to impose upon a claimant a period of limitations "within twelve months next after the discovery of the insured * * * of the occurrence which gives rise to the claim.” During this period, the insured must commence any suit against the insurer for reimbursement of his loss. This period of limitations is nowhere mentioned in the certificate issued to defendant.
The defendant has been unable to show that entry to his apartment was gained by "actual force and violence,” or that "visible marks” resulted from the entry upon and the felonious taking of his property. Under the circumstances described, the question is whether or not the defendant shall have judgment over against Balboa in the amount recovered against the defendant by the plaintiff.
I. Balboa’s Claim Of Untimeliness
By indorsed complaint dated December 28,1973, plaintiff, as assignee of Davega’s contract with defendant, sued the defendant for the unpaid balance then due and owing on the purchase price of the television set. It was not until July 29, 1974, that the defendant impleaded Balboa as a third-party defendant. This was more than 12 months after the June 16 loss by burglary. At first blush, it would therefore appear that the 12 months’ limitations period in Balboa’s master policy has not *1014 been met. Defendant argues, however, that this is a shorter period than the classical six-year span permitted for contract suits and as provided for in CPLR 213(subd 1). Generally, the limitations period of 12 months found in insurance policies, has been upheld by the courts (Dubins v Boston Ins. Co., 26 AD2d 863; Proc v Home Ins. Co., 17 NY2d 239, 245; Gonsenhauser v Home Ins. Co., 52 Misc 2d 272), unless there is some showing that the insured has been lulled into inactivity or a false sense of security by the insurer (Pasmear Inn v General Acc., Fire & Life Assur. Corp., 44 AD2d 647; Rosenthal v Reliance Ins. Co., 25 AD2d 860).
In the case at bar, the defendant, over a period of some five months, pressed his claim pursuant to instructions received from Balboa’s agent, Ricardo. That the defendant relied totally upon these assurances was fully demonstrated by his uncontradicted testimony. It was not until November, 1973, that Ricardo told defendant that the claim had been rejected. No reason was given for the rejection. At no time was the defendant ever told that his time to sue Balboa was limited to 12 months after discovery of his loss. The certificate of insurance given to defendant is mute as to any such condition of suit.
Accordingly, there is shaped for the court a question of an insurer’s conduct and whether or not that conduct was deceptive as such is defined in the ruling cases on the subject. Stated simply, there was nothing more than a certificate of insurance in the hands of a semiliterate citizen of Harlem. And even after he made his claim, he was never told of any conditions which Balboa might assert to bar a law suit; neither was the master policy ever shown to the defendant at any time, either before or after the filing of his claim. Not to exhibit to defendant the master policy under the circumstances here was synonymous with suppression of that writing. Since the certificate given to defendant was silent on the subject, Balboa owed a duty to defendant to tell him why his claim was rejected. It is precisely such conduct by Balboa which now bars it from asserting its claimed defenses to defendant’s third-party process. The rule which applies was set forth in Sassi v Jersey Trucking Serv. (283 App Div 73).
In Sassi, there was no policy provision to support an implication that the parties contemplated a time condition for suing which was "virtually impossible of performance.” There, the court wrote that: "We hold, therefore, that the period of *1015 limitation contained in the policy did not begin to run until the assured was in a position to institute action against the insurance company” (Sassi, supra, at p 78). Under the facts which are here dispositive, the period of limitations would not begin to run until the stated rejection by Balboa of defendant’s claim, thus validating the commencement of the third-party action against the insurer, assuming that the defendant was ever aware of the limitations period after rejection of his claim.
The failure of Balboa to advise the defendant of its master policy limitations period and of its own definition of the kind of burglary it insured against must be equated with an implied invitation to the defendant to rest assured that the only contract between insured and insurer was the company’s certificate of insurance. "The history of statutory insurance clearly indicates that standard policies were made obligatory upon insurance companies to protect ingenuous insureds against the refinements and legalisms devised by the companies. Whenever the Legislature stepped into this area its purpose was to afford the insured more protection, and less obfuscation * * * We are on firm ground then when we say that primarily, standard policies are for the safeguarding of policy holders.” (Conte v Yorkshire Ins. Co., 5 Misc 2d 670, 671.)
This is doubtless the reason for the rule laid down in Lachs v Fidelity & Cas. Co. of N.Y. (306 NY 357) that it is incumbent upon an insurer to give clear notice of noncoverage in order to enforce noncoverage conditions. While Lachs (supra) considered a flight insurance policy, the reasoning is applicable here and it is a reasoning to which Balboa paid absolutely no heed. By not exhibiting to defendant its master policy and by not specifically stating to the defendant, at the time the claim was rejected, that the master policy defined burglary in a specific and limited manner, and by not telling defendant, further, that the same master policy contained a 12 months’ period of limitations, Balboa was, in effect, retreating behind phantom conditions never present in the defendant’s certificate of insurance.
An insurer should be permitted to deny coverage "only when exculpatory clauses are, in fact, brought clearly to the [attention of the purchaser of the policy],” (Kronfeld v Fidelity & Cas. Co. of N. Y., 81 Misc 2d 557, 559, 560 [Mertens, J.]). Commenting upon the kind of cross reference suggested by *1016 Balboa’s certificate of insurance and its relation to a master policy, Mr. Justice Mertens continued, "the policy shows that it is lengthy, complex, full of cross references to other provisions, and replete with technical language with which insurance experts may be familiar but of which the air-travelling public is most likely unaware * * * The well established general rule of construing an insurance policy strictly against the insurer and in favor of the insured, that is, in favor of coverage rather than disclaimer of coverage, flows basically from a realization of the disparity of bargaining power between insurer and insured and the fact that an insurance policy is drafted entirely by the insurance company.”
Here, as in Steen v Niagara Falls Ins. Co. (89 NY 315, 323), the "delay [in suing] is caused by the insurer * * *” thus, the "period of limitation against [the policy’s] enforcement should not, in the absence of plain and unequivocal words requiring such a construction, be deemed to commence”. There was no such plain and unequivocal provision either in the defendant’s certificate of insurance, or ever communicated to him.
II. The Insurance Company’s Deñnition of Burglary
Consistent with the equitable rationale stated as construing limitation periods, it is obvious that the certificate of insurance issued to the defendant says that the merchandise purchased by him was "insured against loss by * * * burglary,” without any modification of that term. This court will not permit the insurer to superimpose upon the contract represented by the certificate of insurance some secret reservation hidden away in another document. A more candid practice would have been for the insurer to exhibit to defendant its master policy from the outset, or certainly, at the time the claim was rejected, so that the insurer’s more refined definition of what it really meant by "burglary” would stand revealed. Absent such a dutiful act, defendant was entitled to accept the term "burglary” in the usual connotation which that term has for a layman. "A contract of insurance, drawn by the insurer, must be read through the average man on the street or the average housewife who purchases it.” (Lachs v Fidelity & Cas. Co. of N. Y., 306 NY 357, 364, supra.)
Revealed, then, is an inherent ambiguity in the contract of insurance between the parties. The Penal Law of New York, it is interesting to note, in defining the term "burglary,” nowhere mentions the necessity of visible marks or forcible *1017 entry to accompany or make out that crime. Section 140.30 of the Penal Law states that "A person is guilty of burglary in the first degree when he knowingly enters or remains unlawfully in a dwelling at night with intent to commit a crime therein”. The sense of this definition is that burglaries are in the nighttime and that such occurrences are generally accomplished through quiet stealth and not through attention-attracting noise and force. In any case, there is absolutely no evidence to dispute the defendant’s oath that his apartment was burglarized and that his insured property was unlawfully removed.
To the extent that no time limitations appear on the face of the certificate of insurance issued to defendant, nor do any restrictions as to the kind of burglary insured against, the certificate, when considered in conjunction with the unexhibited master policy, becomes ambiguous and misleading. So far as defendant was concerned, the certificate was his policy. "The policy as issued is patently ambiguous. * * * The sharp issue to be decided * * * was the extent of the coverage afforded by the policy, which upon its face was ambiguous. The rule is well established that 'Where the meaning of the contract is not clear, the situation of the parties and the surrounding circumstances at the time of the making of the contract are to be taken into consideration.’ ” (Germaine v Safeguard Ins. Co., 7 AD2d 830.)
As far as Balboa’s master policy is concerned, it is no more than a composite subsequent clause which creates an ambiguity as to coverage and as such, must be resolved against the insurer. (See Hartol Prods. Corp. v Prudential Ins. Co., 290 NY 44.) "If an insurance policy or a clause thereof is reasonably susceptible to two different constructions, the one most favorable to the insured must be adopted” (Levinson v Aetna Cas. & Sur. Co., 42 AD2d 811, 812). To the same effect are Tonkin v California Ins. Co. of San Francisco (249 NY 326); Goldner v Ostego Mut. Fire Ins. Co. (39 AD2d 440).
Suffice it to say that, having given the defendant its certificate of insurance, Balboa was bound by the text of that document. No duty was imposed upon the defendant, either directly or impliedly, to demand inspection of the master policy. To impose such a burden upon a layman, would be to assume some expert ability in him to read, to compare and assess specialty language and the meanings to which such words of art are susceptible. General principles of waiver and *1018 estoppel now operate to bar Balboa from intruding its master policy by way of avoiding the loss suffered by defendant.
The proper guideline here in determining the rights and obligations existing between insurer and insured is the " 'reasonable expectation and purpose of the ordinary business man when making an ordinary business contract’ ” (Johnson Corp. v Indemnity Ins. Co. of North Amer., 7 NY2d 222, 227, cited with approval in State Farm Mut. Auto. Ins. Co. v Bush, 46 AD2d 958, 959). And, as stated in the Johnson case (supra) with equal application and force here, "we are not construing a statute, but the words of an insurance policy, and in so doing we must construe the word ['burglary’] as would the ordinary man in the street or ordinary person when he purchases and pays for insurance.” (7 NY2d, at p 227.)
Since Balboa has presented no testimony and has elected to rest solely upon its master policy, there is no evidence whatsoever to support any of its suggested affirmative defenses, whether of limitations or the effective date of the certificate of insurance issued to defendant by it. Balboa has at no time contended that the certificate of insurance possessed by the defendant was ineffective at the time of the burglary; nor would such a contention be permitted to be interposed at the trial juncture of these proceedings. It is uncontroverted that defendant purchased his insurance and paid the first premium demanded of him on June 1, 1973. He considered himself insured from that point on and this belief was buttressed by his receipt of the certificate of insurance. This certificate was the only indicia of insurance possessed by defendant, for, as it appears, that was all that Balboa ever furnished to its insured in transactions of this kind. Therefore, defendant’s good faith belief that he was in fact insured, was reasonable and is sustained by this court. (See Dembitzer v Gilliam, 44 Misc 2d 487, 490.) It is held, accordingly, that the certificate of insurance is binding upon Balboa as of the time of its purchase and payment of the first premium was made, i.e., June 1, 1973.
For all of the foregoing reasons, the issues in this dispute are disposed of as follows: (a) Judgment is directed to be entered in favor of the plaintiff, Avco Installment Sales Co., Inc., and against the defendant Edge, in the sum of $406.32, with costs and interest from the first day of July, 1973; and (b) The third-party plaintiff, Edge, shall have judgment over against Balboa Insurance Company, the third-party defendant, *1019 in the sum of $406.32, with interest thereon from the 1st day of July, 1973, plus costs and disbursements.